06-CV-05261-EXH

Filed 12/05/2003   Page 1 of 12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

WILLIAM JOHNSON and JENNIFER JOHNSON,

Defendant.

Case No. CR03-5463FDB

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

This matter is before the Court on Defendant William Johnson's ("Johnson") motion to suppress the fruits of the search of his residence at 5180 SW Daisy Street in Kitsap County on May 13, 2003. After review of the parties' written briefs and following hearing on November 25, 2003, the Court finds that Johnson's motion shall be granted.

I.

On May 13, 2003, Johnson's daughter, Defendant Jennifer Johnson, was arrested for delivery of marijuana to Michael Murphy, a person under investigation by the Westsound Narcotics Enforcement Team (WestNET). Murphy had sold marijuana on two previous occasions to a confidential informant working for WestNET detectives. On May 13th, Murphy told the informant that he was going to meet a supplier, whom he referred to as "Mrs. Green." Detectives Halsted and

ORDER - 1

EXHIBIT A

other WestNET detectives set up surveillance around Murphy's residence and followed him to a parking lot, where an exchange was made with a female driving a BMW. Detectives initiated a traffic stop on Murphy and arrested him based on his prior distributions of marijuana. A search of his vehicle revealed the package he received from the female at the parking lot. The package contained approximately one quarter pound of marijuana. The detectives then stopped the female's vehicle, identified the driver as Jennifer Johnson, and placed her under arrest for distribution of marijuana. A search of her vehicle resulted in the recovery of a small amount of marijuana and approximately $3,000.00 cash.

After Jennifer Johnson was arrested and in custody, detectives did a police records check which showed that Jennifer Johnson was contacted at Johnson's property in 2000 in relation to a 911 shots fired call. Jennifer Johnson answered the door to a garage/shop (the "shop") when the deputies knocked on it. At that time, the deputies noted the smell of marijuana and heard the sounds of ballasts coming from the shop. Jennifer Johnson told them that she was unaware of any shots fired in the area and in response to their questions, told them that her father grew marijuana in the shop for medicinal purposes. Johnson also told the deputies that he had not heard any shots fired and that he had a permit to grow the marijuana for medicinal purposes. The deputies asked to inspect his marijuana, but Johnson refused to allow them to search the shop or his house. The deputies consulted with the prosecuting attorney, who declined to obtain a search warrant. The deputies then left the property and no further action was taken against Johnson.

Detectives Halsted, VanGesen, Menge, Drake and Schuster went to Johnson's property on May 13, 2003, based on the information they learned from the 2000 report. Johnson was not part of the detectives' earlier investigation of drug-related violations in the spring of 2003. Johnson's name had not come up in their investigations nor had he appeared in any of their surveillances. Both Detectives Halsted and VanGesen testified that their purpose in going to Johnson's property was to obtain his consent to search his house and shop and to search for evidence of a crime.

ORDER - 2

1   At approximately 8:36 p.m., the detectives arrived at Johnson's house in three or four
2   unmarked vehicles. It was after sunset and they had the headlights on in their vehicles. After
3   driving up the driveway and parking in the paved area between the house and the shop, the
4   detectives got out of their cars. Detectives Halsted and VanGesen testified that they could hear the
5   sounds of ballasts coming from the shop. Detective Halsted and one other detective went to the
6   door of the residence and knocked, but received no answer. They then crossed the paved area to
7   knock on the shop door. Detective Halsted and the other detectives with him smelled the odor of
8   marijuana coming from the shop. Detective Halsted went to the bottom of the driveway to call
9   Kitsap County Superior Court Judge Terry K. McCluskey to make a telephonic application for a
10  search warrant. Detective Halsted's request for the warrant was based on the events surrounding the
11  arrest of Jennifer Johnson earlier in the day, the 2000 report and the incriminating observations he
12  and the other detectives had just made while standing in the paved area and at the door of the shop.

13  Shortly after Detective Halsted returned to Johnson's property, Johnson arrived home from
14  the post office, where he had gone to pick up his mail. The detectives informed Johnson that he was
15  under arrest and proceeded to search his property. Detective VanGesen testified that the officers
16  seized approximately 220 marijuana plants and approximately 252 immature marijuana plants.
17  Johnson testified that he had approximately 30 adult plants, 30 immature plants and several cuttings
18  of marijuana in his shop.

19  Johnson's property is located off of SW Daisy Lane in a rural area. His property is
20  surrounded by a fence and woods. There is no mailbox or house number at the entrance to
21  Johnson's property to indicate the location of his residence. A paved driveway, which is gated, is the
22  only entrance to the property. The gate is not always closed or latched. A "No Trespassing" sign is
23  posted on a tree located on the left side of the paved driveway, a few feet in from the gate. The sign
24  is located on the tree at eye level and is made of reflective material. The detectives traveled
25  approximately 144 feet up a hill on the paved driveway to arrive at Johnson's shop. The driveway
26  ORDER - 3

1  travels up a rise and then disappears from view as it travels to the right, between the house and the
2  shop. Only a small portion of the back of Johnson's house is visible from the bottom of the driveway
3  at the location of the "No Trespassing" sign. The shop and house are approximately fifty feet apart.
4  One must continue around the paved driveway another forty-eight feet to arrive at the "front" of the
5  house where the entrance door is located. An aerial photograph reflects that the paved driveway,
6  shop and home are surrounded by a thick growth of tall pine trees. Johnson's property and his
7  neighbor's property to the west are separated by an electric fence, woods and other vegetation.

8  Johnson is the only owner of the property on Daisy Street. Jennifer Johnson owns no interest
9  in her father's property and does not reside at the Daisy Street address. At the time of her arrest,
10 Jennifer Johnson was living at another address on Overra Road and owns property in her own name
11 at a location other than the Daisy Street address.

12                                           II.

13 The scope of Fourth Amendment protection against unreasonable searches and seizures
14 extends to those areas in which a person has a "reasonable expectation of privacy." Katz v. United
15 States, 389 U.S. 347, 360-61, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)(Harlan, J. concurring). See
16 Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984). Under the
17 exclusionary rule, law enforcement officers may not use information obtained in violation of the
18 Fourth Amendment to establish probable cause justifying a search.

19 Johnson argues that he had a reasonable expectation of privacy in his driveway, home and
20 shop, and that the observations of the officers, which were the product of their trespass up his
21 driveway past a clearly posted "No Trespassing" sign, should have been excluded from the probable
22 cause determination which led to issuance of the search warrant.

23 The Fourth Amendment protects those areas in which a person exhibits an actual (subjective)
24 *expectation of privacy and the expectation is one that society is prepared to recognize as reasonable.*
25 United States v. Roberts, 747 F.2d 537, 541 (9th Cir. 1984) (*citing* Katz, 389 U.S. at 361, 88 S.Ct. at
26 ORDER - 4

516 (Harlan, J., concurring). Thus, by posting the "No Trespassing" sign, Johnson exhibited a subjective expectation of privacy. To determine whether that expectation is one that society recognizes as reasonable, the Court must decide whether the area where the detectives made their incriminating observations is within the curtilage of Johnson's residence or belongs instead in the same category as an open field. As explained by the Supreme Court in Oliver, this distinction is critical as the "special protection accorded by the Fourth Amendment to the people in the 'persons, houses, papers and effects,' is not extended to the open fields." "An individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." 104 S.Ct. at 1741.

Detectives Halsted and McGesen testified that they made the incriminating observations in the paved area between Johnson's house and his shop and at the door of the shop. Thus, the question is whether the paved area and the shop are within the curtilage. The Court finds that this area is within the curtilage and that Johnson's asserted expectation of privacy was legitimate for Fourth Amendment purposes.

The determination of whether an area is within the protected curtilage turns on four integral factors being on the relationship of that area to the home. Dunn, 480 U.S. at 301, 107 S.Ct. at 1139. Curtilage questions should be resolved with particular reference to four factual inquiries: (1) the proximity to the home of the area claimed to be curtilage; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. Id.[1]. "Every curtilage determination is distinctive and stands or falls on its own unique set of facts." United States v. Depew, 8 F.3d 1424, 1427 (9th Cir. 1993), *overruled on other grounds by* Johnson, *supra*.

---

[1] "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301, 107 S.Ct. at 1140.

ORDER - 5

1  (1) Proximity of the Area to the Home. The paved driveway abuts both the home and the
2  shop and extends approximately fifty feet between the two structures. There is no fixed distance at
3  which the curtilage will always end. Depew, 8 F.3d at 1427 (60 feet is inside curtilage); United
4  States v. Furrow, 229 F.3d 805, 817 (9th Cir. 2000) (100 feet is inside curtilage); Dunn, 480 U.S. at
5  302 (50 yards supported inference that barn was outside curtilage and visible to observers). Here,
6  the home and the shop are in close proximity to one another, are connected by a paved area, and are
7  not visible to passers-by from the entrance to Johnson's driveway.

8  (2) Enclosure. Johnson's entire property is fenced and the only entrance to the property is
9  the driveway which is posted with the "No Trespassing" sign. The outside perimeter of the property
10 is surrounded by woods and the home, shop and paved area between the two are also surrounded by
11 woods. Activities within the area of the house, paved area and shop cannot be observed by persons
12 passing by the property. Under these circumstances, the Court does not find the absence of an
13 interior fencing compelling. Photographs produced show that the driveway is on a steep rise and
14 turns to the right after disappearing beyond the rise, so that any passers-by would see only a small
15 portion of the driveway and the top portion of the back of Johnson's house. The area in which the
16 detectives stood while making the incriminating observations cannot be seen from the entrance to the
17 driveway and, therefore, can be said to be within the area of land immediately adjacent to the house
18 that is readily identifiable as part and parcel of the house. Id. at 302, 107 S.Ct. at 1140.

19 (3) Use. Johnson testified that he uses the area between his house and shop to sunbathe in
20 the nude or partially nude and that he often walks in the area in the nude or partially dressed. Other
21 than the marijuana grow, Johnson testified that he uses his shop for personal hobbies, such as
22 woodworking, picture framing and exercising. Johnson's friend, Sherri Jones testified that she often
23 sunbathes in the nude or partially nude in that area and that she and Johnson have made love in the
24 area behind Johnson's house on the deck, on the porch, and in the living room. None of the
25 windows in Johnson's house are covered with curtains. From the paved area between the house and
26 ORDER - 6

1   shop, one is able to see and hear what is occurring in Johnson's bedroom.

2   Detective VanGesen testified that they saw no exercise or woodworking equipment in the
3   shop when they executed the warrant. However, at the time the detectives went to Johnson's
4   property for the "knock and talk," they had no objective data indicating that Johnson used his shop
5   for illegal activity rather than those activities associated with the privacies of domestic life. See,
6   e.g., Depew, 8 F.3d at 1427 (tip from informant that "Pepe" was launching his marijuana operation
7   and previous conviction of manufacturing marijuana was insufficient to imply that defendant was
8   engaging in illegal activity at his home).

9   At the time they went to Johnson's property for the "knock and talk," the detectives were not
10  acting on any tip linking Johnson to any criminal activity and in fact, the criminal activity with which
11  they were concerned – the purchase of marijuana by Murphy – had already occurred. The data the
12  detectives were now acting on -- the report from three years ago – indicated that Johnson was
13  entitled under Washington state law to grow marijuana on his property for medicinal purposes. The
14  detectives were also aware that the prosecuting attorney had declined to obtain a warrant and that no
15  further action had been taken against Johnson as a result of the visit in 2000.

16  (4) Steps Taken To Prevent Observation. Johnson chose his property because it is entirely
17  protected by thick forest vegetation. As noted above, the only access to his property is by way of
18  the driveway and only a small part of Johnson's house can be seen from the public road. Johnson
19  keeps no mailbox at the bottom of his driveway or at his house and he receives all his mail at the post
20  office.[2] Johnson's power meter is located on the driveway so that the meter reader does not
21  approach the house or shop to read the meter. Johnson posted the "No Trespassing" sign ten years
22  ago to keep out all uninvited persons. Johnson testified that the "No Trespassing" sign has kept
23  away all uninvited persons except for the deputies who visited in 2000 and the detectives in May

---

[2] This fact is not given much weight, however, in light of Johnson's testimony that the lack of a mailbox is due to juvenile vandalism rather than any attempt to prevent observation.

ORDER - 7

2003.

To gain access to the inner area of Johnson's property, the detectives had to travel up the driveway past the "No Trespassing" sign. Naturally, an officer who trespasses is not necessarily conducting an illegal search. Oliver, 466 U.S. at 184, 104 S.Ct. at 1744. However, the posting of the "No Trespassing" sign is significant in terms of constituting an effort to protect the inner areas of a parcel from observation. Dunn, 480 U.S. at 301, 107 S.Ct. at 1139-40. It is also irrelevant whether the public knows why an individual craves privacy. It is relevant simply that an individual's numerous efforts to ensure privacy were not in vain. See, e.g., Depew, 8 F.3d at 1428.    Although the United States originally disputed the existence of the "No Trespassing" sign on Johnson's property, it stipulated at the hearing that the sign was, in fact, present on the evening of May 13th, when the search took place. Detective Halsted testified that he did not notice the sign when he entered the property. However, the evidence suggests that placement of the reflective sign would have or should have been seen by anyone driving up Johnson's driveway. Detective VanGesen testified that it was dark enough to have the headlights on in his vehicle when he drove up Johnson's driveway. It is, therefore, reasonable to assume, from placement of the "No Trespassing" sign that his headlights would have reflected off of the reflective material of the sign.

The United States relies on United States v. Hammett, 236 F.3d 1054, 1061 (9th Cir. 2001), for the proposition that, where police officers are unaware of a "no trespassing" sign, their entry on the property cannot be considered improper. This is a misreading of Hammet. In Hammett, the officers did not enter the defendant's property by way of the dirt road leading to the defendant's house where he had posted the no trespassing signs. Rather, the officers took a straight path to the home from where they landed their helicopter by crossing an unfenced and virtually unobstructed area of land. A more analogous set of facts is presented in the Depew case where the district court found that there was no sign posted where the agent entered the defendant's property. 8 F.3d at 1428. The Ninth Circuit held that this finding could not be accorded much significance, though,

ORDER - 8

1  because the agent entered from an unusual location, *i.e.*, a location not usually traversed by foot
2  traffic, by crossing a ditch and climbing up a steep embankment.  Id.  In this case, Johnson's
3  property is completely fenced and the driveway, with the "no trespassing" sign, is the only entry on
4  to his property.  The evidence is also clear that the officers gained entry via the driveway and drove
5  past the "No Trespassing" sign with their headlights on where the sign was there to be seen.

6        A careful analysis of the <u>Dunn</u> factors mandates a finding that the area in which the detectives
7  smelled marijuana and heard the ballasts was within the curtilage of Johnson's home.
8  Notwithstanding this finding, the United States maintains that the detectives would be justified in
9  encroaching upon the curtilage because they were conducting a legitimate "knock and talk"
10 procedure.

11

12     B.    **Reasonableness of the Knock and Talk Procedure.**

13       In <u>Davis v. United States</u>, 327 F.2d 301 (9th Cir. 1964), the Ninth Circuit explained
14 the theory behind the reasonableness of a "knock and talk" procedure, which is designed to question
15 a defendant at his residence.  In that case, the officers had an abundance of information from police
16 files, arrestees and a reliable informant that the defendant was trafficking in marijuana on the very
17 weekend in question.  327 F.2d at 303.  The Court found, therefore, that it was not unreasonable for
18 the officers to attempt to peaceably question the defendant about his activities in connection with
19 marijuana.  Id.  The Court expressly noted the "time of day, coupled with the openness of the
20 officers' approach to defendant's doorway, rules out the possible dangers to their persons which
21 might have resulted from a similar unannounced call in the dead of night." Id. at 304.  The Court
22 also stated:

23

24

25

26 ORDER - 9

> *Absent express orders from the person in possession against any possible trespass*, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof – whether the questioner be a pollster, a salesman, or an officer of the law.

Id. [emphasis added].

The United States relies on the Roberts case, arguing that three "no trespassing" signs in that case did not diminish the reasonableness of the officers' approach to the defendant's residence. It is true that the Ninth Circuit did not agree with the defendant's attempt to distinguish his private road from an open field, despite at least three "no trespassing" type signs. However, the private road in the Roberts case was shared by five other residents over whom the defendant had no control. Additionally, in finding that the officers' approach to the defendant's house was reasonable, the Roberts Court, relying on language in Davis, specifically noted that the two agents approached the defendant's door at 12:15 in the afternoon to ask questions based on tips from a reliable source and an anonymous citizen caller.

The facts in this case are quite different. Johnson's driveway is a private driveway which he shares with no other residents. His entire property is fenced and the driveway is gated (although the evidence reflects that Johnson does not always close or latch the gate). Aerial photographs of the area immediately surrounding the house, shop and the paved area between the house and shop, show that this area is almost entirely surrounded by a thick growth of evergreen trees. Five officers in three unmarked cars came on to Johnson's property at sunset, at a time when it was dark enough to use the headlights in their vehicles. The officers were not acting on any tips or other reliable information that Johnson was trafficking in marijuana.

The "knock and talk" cases relied on by the United States share a common fact pattern which is absent from this case; that is, the searches in those cases were preceded by tips of criminal activity related to the *defendant*, which led to the need to "knock" at the defendants' homes to "talk," in

ORDER - 10

furtherance of investigating those defendants' activities. In this case, the crime had already taken place; detectives had already arrested Jennifer M. Johnson after acting on a tip from a confidential informant. Jennifer Johnson's vehicle had been searched and she was under arrest and in custody for distribution of marijuana. Johnson was not part of the detectives' earlier investigation of drug-related violations in the spring of 2003. Johnson's name had not come up in their investigations nor had he appeared in any of their surveillances. The detectives had no evidence that Johnson was trafficking in marijuana or that he was involved with his daughter's activities.

The United States contends, however, that a proper "nexus" exists between Ms. Johnson's activities and the officers' need to question Johnson "as part of the 2003 investigation." That nexus is based solely on the 2000 incident where deputies were at Johnson's home in response to the 911 call. However, as noted above, the detectives knew from the 2000 report that Johnson had a permit to grow marijuana on his property for medicinal purposes and that the Kitsap County prosecutor had declined to obtain a warrant and no criminal charges against Johnson resulted from that visit. The United States argues that from these facts, the Court may assume that Johnson was conspiring with his daughter to distribute marijuana. To make such an assumption, however, the Court must assume that a crime was committed on Johnson's property by Johnson and his daughter in 2000. The evidence does not support such an assumption. Whether one disputes the validity of Johnson's medicinal permit is irrelevant. For purposes of this motion, however, the permit speaks strongly to the detectives' lack of reason to be on Johnson's property after dark ostensibly for a "knock and talk."

The United States also claims that the deputies "in 2000 believed the marijuana grow was substantial in size." However, this claim is completely speculative and is not supported by any evidence in the record. Johnson was under no legal obligation to allow the deputies to search his property in 2000 and the Court declines to assume an admission of guilt from this refusal.

Finally, the United States argues that the detectives had no intent to search Johnson's home

ORDER - 11

or to arrest him, but only to approach his home and talk to him. However, both Detectives Halsted and VanGesen testified that their intent in going to Johnson's home on the 13th was to gain Johnson's consent to search his house and shop and to search for evidence of a crime. This testimony is bolstered by the manner in which the detectives approached Johnson's property - after sunset, in three vehicles, with five officers in attendance. The detectives' approach to Johnson's property also weakens the credibility of any later claim that the purpose of these detectives was to simply "peaceably, at high noon . . . walk up the steps and knock on the front door . . . with the honest intent of asking questions."

For the foregoing reasons, Johnson's motion to suppress shall be **GRANTED** and all evidence seized pursuant to the search warrant at 5180 SW Daisy Street, Port Orchard, County of Kitsap, Washington, shall be suppressed.

DATED this 5th day of December, 2003.


                                        *S/Franklin D. Burgess*
                                        FRANKLIN D. BURGESS
                                        UNITED STATES DISTRICT JUDGE

ORDER - 12